| | |
|---|---|
| SOUTHWEST EFUEL NETWORK, L.L.C., | § |
| | § |
| *Plaintiff*, | § |
| | § |
| v. | § CIVIL ACTION NO. 2:07-cv-311-TJW |
| | § |
| TRANSACTION TRACKING | § |
| TECHNOLOGIES, INC., | § |
| | § |
| *Defendant*. | § |

## MEMORANDUM OPINION AND ORDER

## I.     INTRODUCTION

Plaintiff Southwest EFuel Network, LLC ("Southwest") filed this suit against defendant Transaction Tracking Technologies, Inc. ("3T") on July 25, 2007 alleging infringement of its patents, U.S. patent Nos. 5,787,405 ("the '405 patent") and 5,909,673 ("the '673 patent"). This order addresses the parties' various claim construction disputes. The order will first briefly address the technology at issue in the case and then turn to the merits of the claim construction issues.

## II.    BACKGROUND OF THE TECHNOLOGY

### A.  The '405 patent

The '405 patent describes a method and system within a data processing system for automatically creating a financial instrument utilizing blank paper. The prior art systems permit a user to create a financial instrument using a data processing system that includes a printer and a pre-printed form. Examples of financial instruments include personal checks, payroll checks,

money orders, and beer drafts. The pre-printed forms may be numbered in sequence and may include similar pre-printed parameters such as those relating to personal checks. The invention described in the '405 patent has the goal of eliminating the need to deliver financial instruments from a remote central location by allowing the user to create financial instruments at the remote location on blank paper. Each of the remote stores has a system that is able to communicate with the home office. In some claims, the data processing station at the remote store communicates to the home office via a communications device located at the remote office. In other claims, a controller communicates with the data processing system at the home office via a communications device located at the headquarters. The abstract of the '405 patent states:

> In the present invention, utilizing a data processing system at one location such as the home office, and another data processing system at a remote location such as a convenience store, an authorized convenience store employee may print financial instruments. According to the present invention, pre-printed forms are not needed in order to print financial instruments. When a financial instrument is to be printed, a valid password must first be entered. Thereafter, the employee may insert blank paper into the printer included within the remote data processing system and print a complete financial instrument. All necessary parameters may be printed by the remote data processing system, including financial institution identification number, account number, financial instrument number, date, amount, and payee. A transaction log may be automatically maintained by the remote data processing system. A log entry may be created each time a financial instrument is created. The log entry may include type of financial instrument created, financial instrument number, date, and amount. This information may be periodically transmitted to the home office data processing system.

Claim 1 of the '405 patent is reproduced below:

> A method for creating money orders and vendor drafts using a data processing system and a printer at each of a plurality of remote stores, where each of the plurality of the remote stores is able to communicate with a home office using a communication device connected to the data processing system, the method comprising the steps of:
>
> a) awaiting the selection by a user using the data processing system to create a transaction which is either a money order or a vendor draft requiring a plurality of parameters to create, the plurality of parameters including a dollar amount;

b) prompting the user using the data processing system for entry of each of the plurality of parameters necessary to create the transaction;

c) entering a number associated with the transaction and the dollar amount of the transaction in a log on the data processing system;

d) printing the transaction on the printer;

e) repeating steps (a) through (d) as necessary to create the required money orders or vendor drafts;

f) sending the log to the home office using the communication device at specific intervals; and

g) assembling at the home office the logs from each of the plurality of remote stores and creating a database of all transactions at all remote stores.

## B. The '673 patent

The '673 patent is a continuation-in-part of the application leading to the '405 patent. Thus, the '405 patent and the '673 share much of the same specification, with the '673 patent containing additional disclosure related to the creation and printing of site specific coupons. The '673 patent is similar to the '405 patent, but instead of printing money orders at the remote location it allows the printing of site specific coupons which are specifically tailored to each remote site. For example, instead of distributing thousands of pre-printed coupons for a specific item company wide, a convenience store chain can change what coupons a particular location issues at will and print those coupons at the convenience store location. Thus, one object of the invention relates to creating coupons that are individualized to specific remote locations. The abstract, slightly different than the '405 patent, states:

A central server at a home office is connected to remote processing stations at multiple remote sites such as convenience stores. The remote processing station is used to create and print various financial instruments which include money orders, payroll checks, vendor drafts, and gift certificates. The financial

instruments are printed on blank paper using MICR toner in a standard laser printer, thereby eliminating the need for preprinted forms. Transaction logs are maintained and communicated to the central server where records for all locations are maintained. The central server also authorized payroll checks for the employees of the remote locations and sends authorization to the locations where the actual payroll checks are printed. Additionally, the system can be used to create and distribute site specific coupons to remote locations. A general coupon template is loaded onto the central server of the data processing system along with site specific information to be printed on each coupon. A particular remote processing station at a remote site can call in to the central server and download the general coupon template and the site specific information for that particular site. The remote processing station then combines the template with the site specific information and prints the site specific coupon.

Claim 1 of the '673 patent is reproduced below:

1. A method for printing a site specific coupon at a remote site of a plurality of remote sites using a network comprising a central server at a home office and a processing station at each of the plurality of remote sites operatively connected to the central server, the processing stations including a printer having an internal memory, the method comprising the steps of:

a) loading a general coupon template and at least one site specific information file into the central server;

b) creating a location instruction file on the central server to instruct the processing station at the remote sites to retrieve the general coupon template and the at least one site specific information file designated for use at specific remote sites;

c) accessing the central server by the processing station at one specific remote site, wherein the processing station opens the location instruction file on the central server particular to the specific remote site to identify the general coupon template and the site specific information file for the specific remote site;

d) downloading by the processing station, the general coupon template and the site specific information file identified in the location instruction file to the processing station at the specific remote site;

e) combining the general coupon template and the site specific information file in the processing station to create the site specific coupon; and

f) printing the site specific coupon on blank paper utilizing the printer located at the specific remote site.

## III.     GENERAL PRINCIPLES GOVERNING CLAIM CONSTRUCTION

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).  Claim construction is an issue of law for the court to decide.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history.  *Markman*, 52 F.3d at 979.  The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention.  *Id.*  A patent's claims must be read in view of the specification, of which they are a part.  *Id*.  For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims.  *Id*.  "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims.  Otherwise, there would be no need for claims.  *SRI Int'l v. Matsushita Elec. Corp*., 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).  The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification.  *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992).  Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments.  *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*,

34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (emphasis added) (*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id*. The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id*. at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to and intended to be read by others skilled in the particular art. *Id*.

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id*. at 1315, *quoting Markman*, 52 F.3d at 978. Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id*. at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive

portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through

dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319-24. The approach suggested by *Texas Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id*. at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.* What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id*. The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id*. at 1321-22.

Phillips does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

The patents-in-suit include claim limitations that fall within the scope of 35 U.S.C. § 112, ¶ 6. "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure. . . in support thereof, and such

claim shall be construed to cover the corresponding structure . . . described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6. When a claim uses the term "means" to describe a limitation, a presumption inheres that the inventor used the term to invoke § 112, ¶ 6. *Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007). "This presumption can be rebutted when the claim, in addition to the functional language, recites structure sufficient to perform the claimed function in its entirety." *Id., citing Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003). Once the court has concluded the claim limitation is a means-plus-function limitation, the first step in construing a means-plus-function limitation is to identify the recited function. *See Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). The second step in the analysis is to identify in the specification the structure corresponding to the recited function. *Id.* The "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Medical Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003), *citing B. Braun v. Abbott Labs*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).

The patentee must clearly link or associate structure with the claimed function as part of the quid pro quo for allowing the patentee to express the claim in terms of function pursuant to § 112, ¶ 6. *See id.* at 1211; *see also Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1377 (Fed. Cir. 2001). The "price that must be paid" for use of means-plus-function claim language is the limitation of the claim to the means specified in the written description and equivalents thereof. *See O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997). "If the specification does not contain an adequate disclosure of the structure that corresponds to the claimed function, the

patentee will have 'failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112,' which renders the claim invalid for indefiniteness." *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009), *quoting In re Donaldson Co.*, 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc). It is important to determine whether one of skill in the art would understand the specification itself to disclose the structure, not simply whether that person would be capable of implementing the structure. *See Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999); *Biomedino*, 490 F.3d at 953. Fundamentally, it is improper to look to the knowledge of one skilled in the art separate and apart from the disclosure of the patent. *See Medical Instrumentation*, 344 F.3d at 1211-12. "[A] challenge to a claim containing a means-plus-function limitation as lacking structural support requires a finding, by clear and convincing evidence, that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function." *Budde*, 250 F.3d at 1376-77.

At issue in this case is whether certain claims of the patents-in-suit are indefinite. A claim is invalid for indefiniteness if it fails to particularly point out and distinctly claim the subject matter that the applicant regards as the invention. 35 U.S.C. § 112, ¶ 2. To prevail on an indefiniteness argument, the party seeking to invalidate a claim must prove "by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008). The primary purpose of the definiteness requirement is to ensure public notice of the scope of the patentee's legal right to exclude, such that interested members of the public

can determine whether or not they infringe. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005); *Halliburton*, 514 F.3d at 1249; *Honeywell Int'l Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003). Courts apply the general principles of claim construction in their efforts to construe allegedly indefinite claim terms. *Datamize,* 417 F.3d at 1348; *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1346 (Fed. Cir. 2007). A claim is indefinite only when a person of ordinary skill in the art is unable to understand the bounds of the claim when read in light of the specification. *Miles Labs., Inc. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993); *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1371 (Fed. Cir. 2008). A determination of claim indefiniteness is a conclusion of law. *Exxon Research & Eng'g Co. v. United States,* 265 F.3d 1371, 1375-76 (Fed. Cir. 2001); *Datamize,* 417 F.3d at 1347.

A claim is indefinite only if the claim is "insolubly ambiguous" or "not amenable to construction." *Exxon,* 265 F.3d at 1375; *Young*, 492 F.3d at 1346; *Halliburton*, 514 F.3d at 1249; *Honeywell*, 341 F.3d at 1338-39. A court may find a claim indefinite "only if reasonable efforts at claim construction prove futile." *Datamize*, 417 F.3d at 1347. A claim term is not indefinite solely because the term presents a difficult claim construction issue. *Id.*; *Exxon*, 265 F.3d at 1375; *Honeywell*, 341 F.3d at 1338. "If the meaning of the claim is discernable, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, ... the claim [is] sufficiently clear to avoid invalidity on indefiniteness grounds." *Exxon*, 265 F.3d at 1375; *Halliburton*, 514 F.3d at 1249.

## IV.    AGREED CONSTRUCTIONS

### A. The '405 patent

The following terms of the '405 patent have been agreed to by the parties:

| Claim Language | Agreed Construction |
|---|---|
| creating money orders and vendor drafts | Assembling the plurality of parameters necessary to create a valid financial instrument and printing the valid financial instrument |
| stores | A retail establishment which is physically separated from the location of the home office and not directly connected in any way with the home office |
| remote stores | A retail establishment which is physically separated from the location of the home office and not directly connected in any way with the home office |
| remote locations | A location which is physically separated from the location of the home office and not directly connected in any way with the home office |
| home office | Headquarters |
| selection by a user | The employee or other person at the remote location manually chooses or enters a parameter |
| transaction | All of the steps and parameters necessary to generate a financial instrument |
| vendor draft | Unconditional promise to pay a specified amount of money to a particular supplier |
| prompting the user | A message or symbol from the system to a user appearing on a display screen, requesting more information or indicating that the system is ready for user instructions |
| each of the plurality of parameters necessary to create the transaction | Means the information necessary to create a financial instrument, which may include: financial institution identification number, account number, check or sequence number, facsimile signature, date, amount, and payee |
| log | A file containing various records made concerning the use of a computer system |
| printing the transaction on the printer | Physically depositing the written information necessary to create a valid financial instrument which may include financial institution identification number, account number, check or sequence number, facsimile signature, date, amount, and payee using the electronic device connected to the system |
| specific intervals | Either a date and time or the occurrence of an event such as the creation of a financial instrument |
| database | A set of data grouped together in one location |
| database of all transactions | A set of data containing every transaction for every remote store |

| | |
|---|---|
| at all remote stores | grouped together in one location |
| using blank paper and MICR toner to create a valid financial instrument | Using blank paper and toner containing magnetic particles capable of being automatically read by machine to create an unconditional promise or order to pay a fixed amount of money which is (1) payable to the bearer or to order at the time it is issued; (2) payable on demand; (3) drawn on a bank; and (4) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money |
| valid financial instrument | Legally enforceable financial instrument |
| creating payroll checks | Assembling and/or inputting the plurality of parameters necessary to create a valid financial instrument which may include the number of hours worked by the employee, the pay period, the employee's pay rate, and taxes |
| payroll checks | Financial instruments issued to employees at regular intervals as payment for wages |
| payroll information | Data relating to payroll for the employees at a particular store |
| payroll information, including employee hours | Employee hours and other data relating to payroll for the employees at a particular store |
| payroll file | A file containing the various parameters necessary to print payroll checks |
| payroll subfiles | Files containing the various parameters necessary to print the payroll checks for a specific remote store |
| payroll period | A specific interval at which employees are paid; i.e. weekly, biweekly or monthly |
| payroll deduction amounts | Money subtracted from gross pay |
| calculating a payroll amount | The home office data processing system determines the amount of payroll |
| calculating payroll amounts and deductions | The home office data processing system determines the amount of payroll and deductions |
| printing payroll checks | Physically depositing on paper the written information necessary to create a valid payroll check which may include financial institution identification number, account number, check or sequence number, facsimile signature, date, amount, the number of hours worked by the employee, the pay period, the employee's pay rate, and taxes, and payee using the electronic device connected to the system |
| corresponding to one of the plurality of remote stores | Each payroll subfile does not correspond to more than one store |
| using the communications device | Via the communications device |
| selecting payroll from a menu of options | An employee at a remote store selects payroll from a list of various functions |
| manager's password | A secret sequence of characters for use by a person that supervises |

| | |
|---|---|
| | the work of others |
| controlled by a home office | The headquarters can direct and manage the operations of the remote stores |
| vendor drafts | Unconditional promise to pay a specified amount of money to a particular supplier |
| connected to | Able to communicate electronically with |
| connected to the printer | Able to communicate electronically with the printer |
| active to prompt a user | The display visually presents options to the user |
| data required to complete the selection | Information required to complete money orders, create vendor drafts, and print payroll |
| a list including creating money orders, creating vendor drafts, and printing payroll | A list of various functions including creating money orders, creating vendor drafts, and printing payroll that visually appear on the display |
| send data | Transmit data |
| receiving a log | Taking in a log |
| vendor ID's | Sequence of characters unique to a particular vendor |

**B. The '673 patent**

The following terms of the '673 patent have been agreed to by the parties:

| Claim Language | Agreed Construction |
|---|---|
| site specific coupon | A certificate entitling the holder to a credit or discount which is particular or unique to the individual remote location where it is printed |
| complete site specific coupon | A certificate entitling the holder to a credit or discount which is particular or unique to the individual remote location where it is printed |
| complete coupon | A certificate entitling the holder to a credit or discount which contains all the information necessary to be valid |
| incomplete coupon | A coupon which requires additional parameters to be valid |
| remote site | A location which is physically separated from the location of the home office and not directly connected in any way with the home office |
| remote locations | A location which is physically separated from the location of the home office |
| a network | A system of computers, terminals, and databases able to communicate electronically |
| home office | Headquarters |
| a processing station | A computer or similar device |
| having an internal memory | Having an internal means of storing information electronically |

14

| loading | The central server readies data for use |
|---|---|
| site specific information file | A file located on the central server that includes information such as the amount of the discount, the hours and days the coupon is valid, the address of the valid location. This site specific information is placed in site specific information files. If the general coupon template is a complete coupon the site specific information need only be the information to be modified to make the coupon site specific. This information replaces or overlays the information existing on the complete coupon template. Conversely, if coupon template is an incomplete coupon, the site specific information must include the information necessary to complete every blank in the template. This site specific information is added to the incomplete coupon template to fill in all the blanks |
| a location instruction file | An electronic file containing instructions which tell the data processing system at each remote location which general coupon templates to download and which site specific information files to download |
| creating | Assembling a plurality of parameters |
| to instruct the processing station | To command |
| to retrieve | To locate and read data from storage |
| designated for use at specific remote sites | Corresponding to a single remote location |
| particular to the specific remote sites | Corresponding to a single remote location |
| the processing station opens the location instruction file | The processing station at the remote site interacts with the location instruction file |
| combining | Merging the data from |
| to create the site specific coupon | Combining the general coupon template and the site specific information file |
| printing the site specific coupon on blank paper | Printing a certificate entitling the holder to a credit or discount which is particular or unique to the individual remote location where it is printed on paper that contains no pre-existing information |
| preloading | Transferring the general coupon template to the internal memory of the printer, before transferring the site specific information to the internal memory of the printer |
| after a command to print | Later in time than a command to print |
| printing the coupon on a money order generated by the remote processing station | Physically depositing on paper the written information necessary to create a valid coupon on the same sheet of blank paper on which a money order is printed on the electronic device connected to the data processing system at an individual remote location |

| | |
|---|---|
| overwrites | Replaces |
| completes | Contains additional parameters particular or unique to the remote location where it is printed |
| controlled by a home office | The headquarters can direct and manage the operations of the remote stores |
| storing | Keeping in its internal memory |
| for each of the plurality of remote locations | For every remote location |
| reading | Accessing |
| designated | Labeled |
| fills in | Completes |
| printed and distributed as part of a money order | Physically depositing on paper the written information necessary to create a valid coupon on the same sheet of blank paper on which a money order is printed on the electronic device connected to the data processing system at an individual remote location |

## V.    TERMS IN DISPUTE

### A. The '405 patent

#### 1.    Terms relating to communication

| Claim Language | Southwest's Proposed Construction | 3T's Proposed Construction |
|---|---|---|
| "communicate" | transmit and receive data electronically | transmit and receive data via a telephone system including a modem |
| "communication device" | an electronic device capable of transmitting and receiving data | a telephone system including a modem |
| "by a communications device" | via the communications device | via a telephone system including a modem |
| "sending" | transmitting | transmitting via a telephone system and a modem |
| "sent" | transmitted electronically | transmitted via a telephone system and a modem |
| "transmitting" | transmitting data electronically | sending via telephone system and modem |

The central dispute over the terms relating to communication is whether the preferred embodiment of a telephone system and a modem should be used to limit the claims. The parties rely upon essentially the same argument for all of the terms relating to communication in both the '405 patent and the '673 patent.

Southwest asks the Court to construe "communicate" according to the usual and customary meaning and argues that 3T's proposed construction seeks to improperly import limitations from the preferred embodiment. *See* McGraw-Hill Dictionary of Scientific and Technical Terms, pp. 415, 553 (5th Ed. 1994) (communication: "transmission of intelligence between two or more points over wires or by radio" and device: "a computer or computer component"). Southwest argues that there are many different ways that a computer can communicate with each other, and there is no basis for importing a limitation from the preferred embodiment unless the intrinsic evidence clearly redefines the term. *See Bell Atlantic Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1267-68 (Fed. Cir. 2001); *Phillips*, 415 F.3d at 1315-17. Southwest argues that the passing reference to phoning in money orders in the Summary of the Invention and the drawings does not overcome the heavy presumption that the communication terms in the claims should be given their ordinary meaning and that they should not be used to limit the claims. *See TI Group Auto. Sys. N. Am., Inc. v. Vdon. Am.*, LLC, 375 F.3d 1126, 1138 (Fed. Cir. 2004) ("[T]he fact that the drawings are limited to a particular embodiment does not similarly limit the scope of the claims."). Southwest argues that if the inventor had intended to limit the means of a communication to a telephone system including a modem, the language in the specification would be mandatory and would use the terms must, entire, each, or every, but instead uses the permissive term "may":

> As may be seen, data processing system 10 *may* include a data processing system 12 which *may* communicate with a remote data processing system 14 via a telephone system 16 including a modem 21. Data processing systems 12 and 14 may be implemented by using any suitably configured computer system, such as an IBM compatible or a Macintosh. Data processing system 14 is preferably implemented by using a Verifone model OMMI 490 terminal available from Verifone, Inc., 3 Lagoon Drive, Redwood City, Calif. 94065. This is a compact unit which includes a modem and card reader. A Verifone TXO Workbench Package is a software development system available from Verifone, Inc. for use with the OMNI 490 series terminal. It is an integrated software package that allows an application to be easily developed for that terminal.

'405 patent, 6:17-30 (emphasis added). Further, Southwest argues that the specification clearly states that "[w]hile the invention has been particularly shown and described with reference to a preferred embodiment, it will be understood by those skilled in the art that various changes in form and detail may be made therein without departing from the spirit and scope of the invention" ('405 patent, 18:60-64), and thus shows that the patentee did not intend to limit its invention to the preferred embodiment.

3T argues that the patent specification only depicts a system that utilizes a telephone system including a modem. 3T argues that communication over telephone lines is the only means of communication contemplated by the patentee in the claims and the rest of the specification. *See, e.g.,* '405 patent, Figs. 1 and 4, 6:17-30. 3T argues that the patent does not reference the telephone system as merely a proposed embodiment, but rather describes it as the invention and even refers to information being "phoned in" in the Summary of the Invention. ("These problems are eliminated because the present invention prints the number of the money order on the money order and records it in the log. The money orders printed sold each day are automatically accurately recorded and phoned in as a report to the home office computer." '405 patent, 3:42-46.) 3T also argues that the patentee's use of the term "may" does not mandate a

construction of a term that is permissive of other embodiments or broader than what the term may utilize, and in this case, only one type of communication is disclosed. *See, e.g., Watts v. XL Sys.*, 232 F.3d 877, 883 (Fed. Cir. 2000). 3T argues that after examining the entirety of the patents, including the specifications and the drawings, one of ordinary skill in the relevant art would reach the "inescapable conclusion" that the communication must take place via telephone system including a modem. *See, e.g., Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004).

The Court finds that 3T's proposed constructions on terms relating to communication seek to improperly limit the claims to the patent's preferred embodiment. The Federal Circuit has consistently held that "particular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Innova/Pure Water,* 381 F.3d at 1117; *Electro Med.*, 34 F.3d at 1054 ("particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments"). Even where a patent describes only a single embodiment, absent a "clear intention to limit the scope," it is improper to limit the scope of otherwise broad claim language by resorting to a patent's specification. *Innova/Pure Water*, 381 F.3d at 1117. The Court is not convinced that these broad claim terms should be limited to the patent's preferred embodiment of a telephone system and modem, particularly when there is no intent by the patentee to do such. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (citing numerous cases rejecting the contention that the claims of the patent must be construed as being limited to the single embodiment disclosed and stating that claims are to be given their broadest meaning unless there is a clear disclaimer or disavowal). There are many different ways that a computer

or electronic device can communicate with each other, and even as 3T admitted during oral argument, these communication terms in the claims are broad. Thus, the Court does not limit the construction of these communication terms to the patent's preferred embodiment and construes the terms as follows:

"*communicate*" means "*transmit and receive data electronically*";

"*communication device*" means "*an electronic device capable of transmitting and receiving data*";

"*by a communications device*" means "*via a communications device*";

"*sending*" means "*transmitting data electronically*";

"*sent*" means "*transmitted data electronically*"; and

"*transmitting*" means "*transmitting data electronically.*"

**2.      Terms relating to processing system, processing station, and controller**

| Claim Language | Southwest's Proposed Construction | 3T's Proposed Construction |
|---|---|---|
| "data processing system" | an electronic device capable of manipulating data | a group of devices, except a printer, forming a network that work together to process data |
| "home office data processing system" | an electronic device capable of organizing and manipulating data located at headquarters | a group of devices, except a printer, forming a network that work together to process data located at headquarters |
| "central processing station" | an electronic device capable of organizing and manipulating data located at headquarters | a single device that processes data |
| "central processing system" | an electronic device capable of organizing and manipulating data located at headquarters | a group of devices forming a network that work together to process data |

| "controller" | an electronic device capable of organizing and manipulating data | compact terminal which includes a modem and card reader and an integrated software package that allows an application to be easily developed for that terminal |
| --- | --- | --- |

Southwest argues that these terms are used interchangeably in the patents and should be construed accordingly. *See* '405 Patent, 6:16-23 ("As may be seen, data processing system 10 may include a data processing system 12 which may communicate with a remote data processing system 14 via a telephone system 16 including a modem 21. Data processing systems 12 and 14 may be implemented by using any suitably configured computer system, such as an IBM compatible or a Macintosh. Data processing system 14 is preferably implemented by using a Verifone model OMMI 490 terminal..."). Southwest argues that when an applicant uses different terms it is permissive to infer different meanings but such inference is not conclusive, and in this case, the specification clearly uses the terms interchangeably. *See Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004). Regarding the term "controller," Southwest argues that claim 11 requires a controller at each of the remote stores, that Figure 1 reveals that only device 14 can be the controller, and that device 14 is identified as being a data processing system. *See* '405 Patent, 6:16-23. Thus, Southwest argues that the specification teaches that device 14 can be implemented via a PC, a Macintosh, or a Verifone, and 3T's attempt to limit the controller to the Verifone description is inappropriate.

3T argues that these terms are different and are used differently, and thus should have different meanings. *See Innova/Pure Water*, 381 F.3d at 1119 ("when an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms"). 3T argues that the commonly understood

meaning for "processing station" is "a device that processes data," and that the commonly understood meaning for "processing system" is "a group of devices forming a network that work together to process data." *See* Webster's Third New International Dictionary, Unabridged, Merriam-Webster, 2002 (system: "a group of devices or artificial objects forming a network or used for a common purpose"). 3T argues that the term "processing system" is a generic term that is used to describe the overall system 10, as well as device 12 and device 14. 3T argues that the terms "controller" and "processing system" should be construed differently because these terms are not used interchangeably in the patent's specification and claims and because they have different commonly understood meanings.

3T argues that the fact the patentee uses a different term, "controller," in claim 11 supports the inference that "controller" should be construed in a different and narrower manner than the broader term "processing system" as used generically in claims 1 and 6. For example, claim 11 uses both terms "controller" and "central processing system," and thus 3T argues that they must be something different. 3T argues that the '405 patent specification does not use the term "controller," and although not referred to as a "controller," the only device with a keypad disclosed in the '405 patent, as required by claim 11, is item 14 as shown in Figure 1. 3T argues that the specification teaches that the device 14 may be implemented by any generic computer system, "such as an IBM compatible or a Macintosh," but device 14 may also be implemented by "a compact unit which includes a modem and a card reader." '405 patent, 6:20-26. 3T argues the fact that claim 11 utilizes both a controller at the remote site and a processing station at headquarters implies that they are given different meanings. Further, 3T argues that the '673 patent distinguishes between a personal computer (e.g., a data processing system) and a "keypad

type processing system such as a Verifone" (e.g., a controller). *See* '673 patent, 8:11-13. To give full meaning to both terms, 3T argues that the processing system at the home office may enjoy a broader construction that encompasses generic computer systems while the controller should be construed narrowly.

Southwest proposes an essentially equivalent construction for numerous terms without any apparent basis in the specification for its construction, while 3T's constructions are too limiting based upon the disclosure in the specification. The following portion of the specification is most relevant to this analysis and both parties rely upon it for their constructions:

> As may be seen, data processing system 10 may include a data processing system 12 which may communicate with a remote data processing system 14 via a telephone system 16 including a modem 21. **Data processing systems 12 and 14 may be implemented by using any suitably configured computer system, such as an IBM compatible or a Macintosh. Data processing system 14 is preferably implemented by using a Verifone model OMMI 490 terminal** available from Verifone, Inc., 3 Lagoon Drive, Redwood City, Calif. 94065. **This is a compact unit which includes a modem and card reader.** A Verifone TXO Workbench Package is a software development system available from Verifone, Inc. for use with the OMNI 490 series terminal. It is an integrated software package that allows an application to be easily developed for that terminal.

'405 patent, 6:17-30 (emphasis added). The specification is clear that a data processing system may be implemented by any suitably configured computer system, such as an IBM compatible or Macintosh, or by a Verifone, which is a compact unit which includes a modem and card reader. *See* '405 patent, 6:17-30. The specification and claims do not appear to differentiate between the terms "data processing system," "home office data processing system," "central processing system," and "central processing station," except for being physically located at different locations. For example, the "data processing system" is located at a remote location and the "home office data processing system" or "central processing system" is located at headquarters.

Thus, apart from their physical locations, one of ordinary skill in the art would equate these different terms to mean the same thing.

The parties agreed for the '673 patent that the term "processing station" means "a computer or similar device." The Court finds no reason why the term "processing station" should not be given the same meaning in the '405 patent. Further, the Court finds the agreed upon definition for "processing station" includes an IBM compatible or Macintosh, which are examples provided by the specification of the term "data processing system." Thus, taking a similar approach to the parties' agreed upon construction for the related term "processing station," the Court construes the terms as follows:

"*data processing system*" means "*a computer or similar device that processes data*";

"*home office data processing system*" means "*a computer or similar device that processes data at headquarters*";

"*central processing system*" means "*a computer or similar device that processes data at headquarters*"; and

"*central processing station*" means "*a computer or similar device that processes data at headquarters.*"

Regarding the term "controller," the '405 patent specification does not use the term "controller" and the term is only used in claim 11. The patentee used the term "processing system" in independent claims 1 and 6, while it used the terms "controller" and "central processing system" in claim 11. Based upon the generally understood meaning of these terms, the terms "processing system" and "processing station" are much broader than the term "controller." Although Southwest and 3T agree that the controller is represented by device 14,

they argue that device 14 should be construed differently. Southwest proposes a construction equivalent to a "data processing system" that is broader than the disclosed IBM compatible or Macintosh, whereas 3T essentially proposes a narrow construction equivalent to the disclosed Verifone device. The patentee used different terms in claiming its invention, and although these terms are related, the patentee clearly used different terms to give different scopes to its claimed invention. *See Innova/Pure Water*, 381 F.3d at 1119.

The Court finds that the terms relating to "processing system" or "processing station" should be given different constructions than the term "controller." The Court finds that the term "controller" is not as broad as a "data processing system," such as an IBM compatible or Macintosh but is not as narrow as the disclosed Verifone device that uses a modem. Further, claim 11 expressly requires that the controller include a "keypad" and a "display." As contrasted to claims 1 and 6, which use a data processing system and a communications device at the remote location to interface with the home office, claim 11 requires a communication device and a central processing system at headquarters but just a controller at the remote office. Thus, based on the language of claim 11, the Court finds that the controller is required to have some type of communication unit built into it to interface with the home office, and is thus similar to the Verifone device disclosed in the specification. However, the Court has rejected 3T's attempts to limit the claims to the patent's preferred embodiment of a telephone system and modem, and will similarly not limit the term "controller" to the narrow definition of a Verifone using a modem. Thus, the Court construes the term "*controller*" to mean "*a compact electronic device including a keypad and display, capable of inputting, organizing, and manipulating data and transmitting and receiving electronic data.*"

### 3.    Terms relating to data entry

| Claim Language | Southwest's Proposed Construction | 3T's Proposed Construction |
|---|---|---|
| "entering a number associated with the transaction" | generating and storing a unique number which identifies the transaction and its parameters | the user, utilizing numeric keys, inputs a number associated with the transaction |
| "entering employee hours" | inputting the number of hours worked by an employee for a pay period | the user, utilizing numeric keys, inputs the employee hours |
| "for entry of a selection" | to input a selection | to input a selection using a keypad |

In general, Southwest argues that the first two terms relating to entering information do not require user input, while 3T argues that all of the terms using "enter" or "entering" require input by and interaction with a user.

Southwest argues that the specification is clear that the entering step referred to in claim 1(c) is not limited to manual data entry. Southwest argues that the specifically teaches that it is the data processing system that generates the number and records it automatically in a log:

> Block 88 illustrates the establishment of a money order log. **Each time a money order is printed, data processing system 14 writes a description of the money order into the current money order log.** The description includes the date and time of purchase, the store where the money order is purchased, the amount of the money order, the fee amount, and the check number.

> **After a money order is printed, the parameters are recorded in a log.** The money order number will be associated with the date and amount. In this manner, problems associated with known systems may be avoided. In the present invention, utilizing blank paper instead of pre-printed forms, money order numbers are printed and recorded simultaneously with the date and amount. Therefore, no particular sequence of money order number is expected or necessary.

'405 patent, 8:51-57, 5:17-25 (emphasis added).  Southwest argues that because one of the innovative features of the invention is to eliminate problems with money order logs containing

incorrect tracking numbers, having a user enter manual data goes against the spirit of the invention and invites all types of errors that the invention is trying to eliminate.

3T argues that all of the terms using "enter" or "entering" require input by and interaction with a user. 3T relies on the portion of the specification that states "[n]umeric keys 24 are used to enter numeric data." '405 patent, 7:43. 3T argues that if data is entered, then someone, a user, must enter it in.

The Court finds that the specification teaches that data and other parameters may be received in response to a user entry and that some may be received from the data processing system at headquarters. *See* '405 patent, 7:6-9 ("The second plurality of parameters may be received in response to a user entry of the parameters, or may be received from data processing system 12."); 8:52-54 ("Each time a money order is printed, data processing system 14 writes a description of the money order into the current money order log.") If the Court were to require user input as part of the construction of these terms, it would eliminate the teaching in the specification that allows for entry of information by the data processing system without user input. Thus, the Court finds that user input is not required for the first two disputed terms in this section.

Regarding the first disputed term in this section, Southwest's proposed construction lacks specification support and 3T's proposed construction improperly requires user input. The court finds that the term "entering" means "inputting," which follows the language that the parties generally propose in reference to the "entering" or "enter" terms. Thus, the Court construes the term "*entering a number associated with the transaction*" to mean "*inputting a number associated with the transaction*." Regarding the second disputed term in this section, 3T's proposed construction again improperly requires user input. Further, because the phrase "for a

pay period" comes directly after the disputed term, it is not necessary to include that language in the construction of this disputed term. Thus, the Court construes the term "*entering employee hours*" to mean "*inputting the number of hours worked by an employee*." Regarding the third disputed term in this section, it is clear by the language of claim 11(b) that the controller includes a keypad and that the user enters a selection or data on the keypad. Thus, any input on the controller must be done through the keypad. The Court construes the term "*for entry of a selection*" to mean "*to input a selection using a keypad.*"

4.     **"keypad"**

Southwest argues that "keypad" means "an input device consisting of buttons," whereas 3T argues that it means a "small hand held keyboard."

Southwest argues that 3T's proposed construction seeks to improperly import limitations from the preferred embodiment. Southwest argues that a reading of the relevant language in the claims and specification reveals that the term "keypad" was never intended to limit it to a "small handheld keyboard." The specification states that "Data processing systems 12 and 14 may be implemented by using any suitably configured computer system such as an IBM compatible or Macintosh" or though a Verifone. '405 patent, 6:19-24. Southwest argues that both types of input devices are represented in Figure 1, with data processing system 12 depicted with a full keyboard and data processing system 14 depicted as a Verifone. Southwest argues that its proposed construction takes into account the different configurations explicitly contemplated in the '405 patent.

3T argues that Southwest's broad definition does not encompass the plain and ordinary meaning of the term keypad nor as used in the specification or claims. 3T argues that a keypad is

not identical to a keyboard. Rather, the plain and ordinary meaning of the term "keypad" is "a small often hand-held keyboard." *See* Webster's Third New Int'l Dictionary, Unabridged, Merriam-Webster, 2002. 3T argues that this definition is consistent with the specification and drawings which discuss and depict a small, handheld keyboard. *See* '405 patent, 7:22-23 and Fig. 2 ("FIG. 2 is a pictorial representation of a keyboard 19 which may be utilized with data processing system 14.") 3T argues that, similar to the term "controller," the term "keypad" is not used in any other claim. 3T argues that the other claims do not discuss a keyboard or keypad because the data processing system (i.e., a computer) already has a full-size keyboard. Thus, similar to the term controller, the term keypad should be narrowly construed.

The Court finds that Southwest's proposed construction seeks to broaden the narrow term keypad to a type of generic input device. The patentee specifically used the term "keypad" and a keypad is only used in conjunction with the controller in claim 11, which the parties have agreed is represented by item 14 in the specification. Further, Figure 2 is represented in the specification as the keyboard of controller 14. '405 patent, 7:22-23 and FIG. 2. Southwest's construction of the term is overly broad given the traditional understanding of the term "keypad" as well as the usage of the term in the specification. The Court finds that the definition provided by 3T is what one of ordinary skill in the art would understand the term to be based upon the disclosure in the specification. Thus, consistent with 3T's proposed construction, the Court construes the term "*keypad*" to mean "*small hand held keyboard*."

5.      **"system for managing financial instruments"**

Southwest argues that "system for managing financial instruments" means "a data processing system, software, display, keypad, and printer," whereas 3T argues that it means a

"network of devices and employees that interact to manage financial instruments." Southwest and 3T provide little guidance for their proposed constructions.

The Court finds that Southwest's proposed construction lacks specification support and does not follow the language of claim 11. The Court finds that the 3T's proposed construction for the term "system" is more appropriate for the commonly understood meaning of the term if the extraneous term "employees" is eliminated. Thus, the Court construes the term "*system for managing financial instruments*" to mean "*network of devices that interact to manage financial instruments*."

**6.      "blank paper"**

Southwest argues that "blank paper" means "paper suitable for printing checks which contains no printed matter on it excluding watermarks or other marks or features present for security purposes," whereas 3T argues that it means "paper that is eight and one half by seven inches which may have background color or printing or distinctive watermarks or other overall indicia but which is otherwise unprinted as contrasted with preprinted forms."

Southwest provides little discussion for its proposed construction and argues that 3T's proposed construction improperly limits blank paper to a particular size. 3T argues that the specification specifically states that "any suitable blank paper of the appropriate size may be used." '405 patent, 6:59. Thus, 3T argues that the paper must be eight and one half by seven inches in order to be of an appropriate size because the printer must be designed to accommodate this size paper. '405 patent, 7:50-53. 3T also argues that the specification is in agreement with its proposed construction:

> According to the present system, pre-printed forms are not necessary. **Any suitable blank paper of the appropriate size may be used. The term "blank**

**paper" is meant to preferably comprise any suitable "security paper" which may have background color or printing or distinctive watermarks or other overall indicia but which is otherwise unprinted as contrasted with preprinted forms.** Data processing system 14 will automatically determine the first plurality of parameters necessary to print a particular type of financial instrument.

'405 patent, 6:58-67 (emphasis added). 3T argues that the specification provides suitable type and appropriate size requirements for the blank paper. 3T argues that Southwest improperly ignores the size requirement and focuses only on the suitability of the paper.

The Court finds that 3T's attempt to limit "blank paper" to a paper of one physical size is an improper limitation. There is no express teaching in the specification that would limit blank paper to be a particular size, and instead, the specification provides a generic definition for blank paper. *See* '405 patent 6:58-67. Further, the Court notes that the parties implicitly agreed to a construction for blank paper for the '673 patent and did not limit it to a particular size. For the '673 patent the parties agreed that the phrase "printing the site specific coupon on blank paper" in the '673 patent means "printing a certificate…on paper that contains no pre-existing information," which implies that blank paper means "paper that contains no pre-existing information." Thus, the Court construes the term "*blank paper*" to mean "*paper which may have background color or printing or distinctive watermarks or other overall indicia for security purposes but which otherwise contains no pre-existing information*."

## 7. Terms relating to printer or printing

| Claim Language | Southwest's Proposed Construction | 3T's Proposed Construction |
|---|---|---|
| "a printer at each of the remote locations able to print the financial instruments" | a device at each remote location capable of physically depositing the written information necessary to create a valid financial instrument which may include financial institution identification number, account number, check or sequence number, facsimile signature, date, amount, and payee using the electronic device connected to the system using blank paper and toner containing magnetic particles capable of being automatically read by machine | a laser printer fitted with a conventional MICR toner cartridge that can (1) ignore a paper size error or print on paper that is eight and one half by seven inches; and (2) accept fonts downloaded by a user |
| "print the financial instruments on blank paper" | physically depositing on paper the written information necessary to create a valid financial instrument which may include the financial institution on which the instrument is drawn, financial institution identification number, account number, check or sequence number, facsimile signature, date, amount, and payee using the electronic device connected to the system using blank paper and toner containing magnetic particles capable of being automatically read by machine on paper suitable for printing checks which contains no information pre-printed on it such as instrument number, bank routing number, payor name, payee name, bank name, or signature | the printer prints financial instruments on paper that is eight and one half by seven inches which may have background color or printing or distinctive watermarks or other overall indicia but which is otherwise unprinted as contrasted with preprinted forms |

Neither party addressed these terms during oral argument. Further, Southwest provides little discussion for its proposed constructions of these terms in its briefing. 3T argues that the specification unequivocally describes what a printer is and what it must be able to do. 3T argues that claim terms relating to the printer must be limited to a printer fitted with a conventional MICR toner cartridge and must be able to ignore a paper size error, or be able to print on paper

that is eight and one half by seven inches. 3T relies on the abstract of the '673 patent that states that the financial instruments are printed "using MICR toner in a standard laser printer." 3T also relies on portions of the specifications that describe what a printer must be able to do. *See* '405 patent, 6:30-34, 7:49-62. Thus, 3T incorporates provisions from the preferred embodiment of the specification that describe what a printer "must" have.

The Court notes that the parties implicitly agreed to a construction for a term relating to printer or printing in the '405 patent. The parties agreed that the phrase "printing the transaction on the printer" means "physically depositing the written information necessary to create a valid financial instrument which may include financial institution identification number, account number, check or sequence number, facsimile signature, date, amount, and payee using the electronic device connected to the system." Similarly, in the '673 patent, the parties agreed that the phrase "printing the coupon on a money order generated by the remote processing station" means "physically depositing on paper the written information necessary to create a valid coupon on the same sheet of blank paper on which a money order is printed on the electronic device connected to the data processing system at an individual remote location." The Court notes that in these similar and agreed upon terms, 3T did not limit the printing terms to the preferred embodiment of the specification.

The Court finds that Southwest's proposed constructions are similar to the agreed upon constructions for the related printing terms. Further, the Court finds that a printer as claimed was not intended to be limited to certain preferred embodiments of the specification. The Court construes the term "*a printer at each of the remote locations able to print the financial instruments*" to mean "*a printer at each of the remote locations that can physically deposit the*

*written information necessary to create a valid financial instrument*." The Court construes the term "*print the financial instruments on blank paper*" to mean "*physically deposits the written information necessary to create a valid financial instrument on blank paper.*"

## B. The '673 patent

### 1. "a general coupon template"

Southwest argues that the term means "a general form for a coupon which can require additional parameters particular or unique to the remote location where it is printed to be completed." 3T argues that the term means "a reusable generic coupon form which includes no information about a specific location."

Southwest argues that while 3T's proposed construction could be interpreted correctly, it might mislead the jury into thinking that a general coupon template must be incomplete. Southwest argues that its construction agrees with the specification:

> A site specific coupon is created by using a general coupon template and modifying the template with information specific to a particular location. Some information like the product, product logo, legal disclaimer, and the like is fixed for all coupons while other information like the discount, expiration date, location and the like is variable. **A general coupon template can either be a digital representation of a complete coupon including all art work, logos, and text, or it can be an incomplete coupon with art work, logos and general text with specific information missing such as the amount of the discount, valid hours and dates, particular product or valid location.** If the general coupon template is a complete coupon the site specific information used to make the site specific coupon overwrites the corresponding information on the complete coupon replacing it when the site specific coupon is printed. Likewise, if the general coupon template is an incomplete coupon the site specific information is inserted into the blanks on the template, thereby creating a complete site specific coupon.
>
> Referring now to FIG. 5A, block 602 represents loading a general coupon template on central server 12 from FIG. 1. The general coupon template from block 602 is the necessary art work, logos and general information to appear on the final coupon. **The general coupon template can be a complete coupon**

**including all necessary information, or can be an incomplete coupons which is missing the information that is particular to each individual site.**

'673 patent, 7:1-19, 21:3-10 (emphasis added). Thus, Southwest argues that the general coupon template can be complete and usable right from the start or it can require additional information particular to each location.

3T argues that the actual dispute revolves around whether the term should be construed to exclude templates that contain information specific to a particular location. 3T argues that the specification uses the term "a general coupon template" to refer to a coupon that does not have information specific to a particular location and that is capable of being used and reused by multiple locations:

> Yet another object of the invention relates to creating coupons that are individualized to specific remote locations. A general coupon template is provided, and details customized to a specific location are provided that are added to the general template to form a site specific coupon.
>
> A site specific coupon is created by using a general coupon template and modifying the template with information specific to a particular location.

'673 patent, 3:52-56, 7:1-3. Further, 3T argues that if the general coupon template already contains information particular to a specific location it would be unnecessary to combine the template with the site specific information file to make a site specific coupon as required in claim 1, because the parties have already agreed that the term "site specific information file" includes information unique to a specific location. Thus, the general coupon template should not include information about a specific location. 3T argues that Southwest's proposed construction should be rejected because it may permit the template to include site-specific information.

The Court finds that the specification is clear that the general coupon template may be complete or incomplete. *See* '673 patent, 21:3-10. If the coupon is complete, "the site specific

information used to make the site specific coupon overwrites the corresponding information on the complete coupon replacing it when the site specific coupon is printed." '673 patent, 7:13-16. The Court also finds that claim 1 expressly requires "combining the general coupon template and the site specific information file in the processing station to create the site specific coupon." Southwest's proposed construction implies that site specific information does not have to be combined with the template, and thus makes the language of claim 1 unnecessary which requires combining the general coupon template with the site specific information file to make a site specific coupon. *See Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").  On the other hand, 3T's proposed construction does not take into account the fact that a general coupon template may be a complete coupon that may have site specific information wherein such information is replaced with the relevant site specific information when printed.  To give full meaning to the claim language, and to allow the general coupon template to be a complete coupon or an incomplete coupon, the Court construes "*a general coupon template*" to mean "*a generic form for a coupon which includes no site specific information with respect to the specific location where the site specific coupon is to be printed.*"

2.      **"central server"**

Southwest argues that the term means "an electronic device capable of organizing and manipulating data located at headquarters," whereas 3T argues that the term means "in a network, a device or computer system that is dedicated to controlling or directing a processing station."  Thus, Southwest proposes a construction for the term "central server" that is similar to its proposed constructions for the terms "controller" and "data processing system" in the '405

patent. Southwest bases its argument on the following phrase: "As may be seen, data processing system 10 may include data processing system 12 which may also be referred to as central server 12. Data processing system or central server 12…" '673 patent, 8:2-5. Thus, Southwest argues that the specification equates the terms "data processing system" and "central server" with the only difference being that the "central server" is located at headquarters.

3T argues that the plain and ordinary meaning of the term "server" is narrower than the terms "processing station" or "processing system." 3T bases its proposed construction on the dictionary definition of "server." *See* IEEE Standard Dictionary of Electrical and Electronic Terms, pp. 972-73 (6th ed. 1996) (server: "in a network, a device or computer system that is dedicated to providing specific facilities to other devices attached to the computer network"). 3T argues that the specification's use of the term is consistent with its plain and ordinary meaning. For example, in the Summary of the Invention, the patentee describes the role of the central server in creating site specific coupons. *See* '673 patent, 3:57-67. Further, the central server "tells the remote processing which generalized coupon templates and which site specific information files should be downloaded by that specific site." *Id.* at 3:65-67.

The Court finds that, similar to the rationale set above in the '405 patent on terms relating to data processing system, the patentee used different terms in claiming its invention to give different scopes to its claimed invention. The term "central server" was intended to mean something different than other related terms, such as data processing system, and the Court finds that these different terms should be given different meanings. *See Innova/Pure Water*, 381 F.3d at 1119. Southwest's proposed construction eliminates the meaning of the term "server" by essentially equating its construction to the terms "controller," "data processing system," central

processing station," and "central processing system."  The Court also finds that the term "server" is narrower than the terms "processing station" or "processing system," and is narrower than Southwest's proposed construction.  Further, the Court finds that the "central server" as used in the specification and claims is connected via a network to each of the processing stations. *See* '673 patent, 3:59-67, 6:23-28, 8:2-7, 8:31-34.  Thus, consistent with the specification and the term's generally understood meaning, the Court construes the term "*central server*" to mean "*a computer system that is dedicated to communicating over a network with the processing station at each of the plurality of remote sites.*"

>    **3.**     **"a site instruction file"**

Southwest argues that the term means "an electronic file containing instructions which tell the data processing system at each remote location which general coupon templates to download and which site specific information files to download," which is the agreed upon construction for the term "a location instruction file" as used in claim 1 of the '673 patent.  3T argues that the term "site instruction file" is indefinite because the term does not appear in the specification, it only appears in claim 6 of the '673 patent, and that it has no readily ascertainable meaning.  Claim 6 of the '673 patent requires both a "site specific information file" and a "site instruction file."  Claim 1 requires a "site specific information file" and a "location instruction file."  The parties have agreed to a construction of the terms "site specific information file" and "location instruction file," but disagree as to the term "site instruction file."

The Court does not find this term to be indefinite.  A claim is indefinite only if the "claim is insolubly ambiguous, and no narrowing construction can properly be adopted." *Exxon*, 265 F.3d at 1375; *Honeywell*, 341 F.3d at 1338-39.  This term is not "insolubly ambiguous" so as to

prevent construction. *See Young*, 492 F.3d at 1346 (claims are considered indefinite when they are "not amenable to construction or are insolubly ambiguous"). While it is true that "site instruction file" is not defined or used in the specification, the terms "site" and "location" have the same meaning as found throughout the specification and as agreed upon by the parties. Thus, one of ordinary skill in the art would understand that "site instruction file" and "location instruction file" mean the same thing, and would thereby understand the metes and bounds of the claim. *See Exxon*, 265 F.3d at 1375 ("If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.") The Court finds that the term "a site instruction file" should have the same meaning as the agreed upon construction for "a location instruction file." Thus, the Court construes the term "*a site instruction file*" to mean "*an electronic file containing instructions which tell the data processing system at each remote location which general coupon templates to download and which site specific information files to download.*"

### 4. "means for creating"

During oral argument, both parties agreed that the term is a means-plus-function limitation. However, neither party suggests a function that the limitation performs. Further, neither party provides a corresponding structure for this limitation. Instead, 3T proposed in its briefing that the term "means for creating" should be construed to encompass claims 1 and 11 of the '405 patent, both directed to methods for creating financial instruments, and then for the proposed construction of this term merely recites the steps of these two claims in their entirety.

The parties have agreed, and the Court finds, that this term is a means-plus-function

limitation. Next, the Court must construe the function and corresponding structure of the means-plus-function limitation. *See Micro Chem.,* 194 F.3d at 1258. Dependent claim 12, which contains the disputed claim term, states the following: "[t]he system of claim 6 wherein the system also includes **means for creating payroll checks, money orders and vendor drafts** for each of the plurality of remote locations." (emphasis added). Thus, based upon the claim language, the "means for creating" is directed towards financial instruments. The claims of the '405 patent are generally directed to creating and printing financial instruments, including payroll checks, at each of a plurality of stores. In a slightly different variant, the claims of the '673 patent are generally directed to creating and printing site specific coupons at each of a plurality of stores. However, the '673 patent also has numerous references to the printing of payroll checks and other financial instruments. *See* '673 patent, 9:15-17 ("Remote processing station 14 may determine the first plurality of parameters in order to **create and print** a complete payroll check.") (emphasis added). Indeed, the abstract of the '673 patent provides that "[t]he remote processing station is used to **create and print** various financial instruments which include money orders, payroll checks, vendor drafts, and gift certificates." (emphasis added). Thus, the function of the term "means for creating," in the context of the claim and the specification, means printing of the financial instruments. Further, the claim already includes a printer that can print the financial instruments. *See* claim 6. Thus, the Court finds that the function of the "means for creating" term is "*printing payroll checks, money orders, and vendor drafts.*"

The Court must next construe the corresponding structure. *See Micro Chem.,* 194 F.3d at 1258. While the claims of the '405 patent are generally directed to creating and printing

40

financial instruments, the claims of the '673 patent are generally directed to creating and printing site specific coupons. Indeed, a primary purpose of the '673 patent as a continuation-in-part application was to add material in the specification specifically directed to combining general coupon templates with site specific information to make a site specific coupon. The only claim of the '673 patent that mentions creating financials instruments, i.e. "payroll checks, money orders, and vendor drafts," is claim 12, which contains the disputed means-plus-function limitation. In the specification of the '673 patent, the only new material added that discusses payroll checks also identifies source code for the printing of checks that was attached:

> The source code of the portion of the program implementing **the printing of money orders, vendor drafts, payroll checks,** and gift certificates as well as the combining of the coupon template and the site specific information in the printer to form a complete coupon is **attached hereto**. Any suitable laser printer using the Hewlett Packard PCL-4 or PCL-5 command set can be used. The source code begins with a definition of variables used in program, and then loads general information into the printer like the maximum amount available for money orders, signature files, store IDs, and templates. At this point, the program is broken down into cases or objects that are called individually when needed by the program. Cases not specifically discussed below have been reserved for future use.

'673 patent, 22:51-65 (emphasis added). The specification then provides more detail on the objects of the program using the source code. *See* '673 patent, 22:66-23:54. The specification expressly states that the source code is for implementing "the printing of money orders, vendor drafts, payroll checks, …" ('673 patent, 22:51-52) which are the same three types of financial instruments recited in claim 12 of the '673 patent. The Court finds that one of skill in the art would understand that this disclosed source code, which was also attached to the application

when filed, is the structure of the printing function of the "means for creating" term.[1]  *See*

*Medical Instrumentation*, 344 F.3d at 1210.  The corresponding structure for the recited function,

therefore, is the "*source code of the portion of the program implementing the printing of money*

*orders, vendor drafts, and payroll checks disclosed or referred to by col. 22, l. 51 – col. 23, l. 54*

*of the '673 patent.*"

     5.       **"general information"**

Southwest argues that the term means "information not particular to a specific remote

location," whereas 3T argues that the term means "the maximum amount available for money

orders, signature files, store IDs, and template."  The parties provide no substantive analysis or

discussion for their proposed constructions.  The parties appear to rely upon different portions of

the specification with different meanings of the term "general information."  It appears that

Southwest relies on the following portion of the specification for its construction:

> Referring now to FIG. 5A, block 602 represents loading a general coupon
> template on central server 12 from FIG. 1. The general coupon template from
> block 602 is the necessary art work, logos and **general information** to appear on
> the final coupon. The general coupon template can be a complete coupon
> including all necessary information, or can be an incomplete coupons which is
> missing the information that is particular to each individual site.

'673 patent, 21:3-10 (emphasis added).  It appears that 3T relies on a different portion of the

specification for its construction:

> The source code begins with a definition of variables used in program, and then
> loads **general information** into the printer like the maximum amount available
> for money orders, signature files, store IDs, and templates. At this point, the
> program is broken down into cases or objects that are called individually when

---

[1] During oral argument, the Court asked counsel for 3T whether this disclosed source code is the
corresponding structure for the "means for creating" term, and 3T's counsel stated that it had no
objection to such a finding.  Counsel for Southwest never discussed or suggested any
corresponding structure for the term.

needed by the program. Cases not specifically discussed below have been reserved for future use.

'673 patent, 22:58-65 (emphasis added).

Thus, in part, the Court must decide which specification portion is more relevant to the disputed claim language to determine the term's meaning. In relevant part claim 7 states the following: "The system of claim 6 wherein the general coupon template includes artwork, logos and general information, …" The portion of the specification in which Southwest relies upon is very similar and states the following: "The general coupon template from block 602 is the necessary art work, logos and general information to appear on the final coupon." '673 patent, 21:5-7. The Court finds that the "general information" of claim 7 is referring to the specification portion relied upon by Southwest. Further, this portion of the specification references Block 602 as the general coupon template, and the corresponding Block 602 in Figure 5A states "[r]eceive templates without location specific information." Thus, consistent with Southwest's proposed construction, the Court construes the term "*general information*" to mean "*information not particular to a specific remote location.*"

6. **"blank paper"**

Southwest proposes different constructions for the term "blank paper" for the '673 patent. For claim 1 of the '673 patent, Southwest proposes that "blank paper" means "paper which may have background color or printing or distinctive watermarks or other overall indicia but which is otherwise unprinted as contrasted with preprinted forms." For claim 11 of the '673 patent, Southwest proposes that "blank paper" means "paper suitable for printing checks which contains no printed matter on it excluding watermarks or other marks or features present for security purposes." 3T proposes a construction that is equivalent to the one it proposed in the '405

patent: "paper that is eight and one half by seven inches which may have background color or printing or distinctive watermarks or other overall indicia but which is otherwise unprinted as contrasted with preprinted forms."

The Court finds no reason, and the parties have presented none, why the term "blank paper" should be given different meanings in the '405 patent and the '673 patent. Thus, for the same reasons as stated above in reference to the term "blank paper" in the '405 patent, the Court consistently construes the term "*blank paper*" in the '673 patent to mean "*paper which may have background color or printing or distinctive watermarks or other overall indicia for security purposes but which otherwise contains no pre-existing information.*"

### 7. Terms related to communication

| Claim Language | Southwest's Proposed Construction | 3T's Proposed Construction |
|---|---|---|
| "accessing the central server by the processing station at one specific remote site" | a processing station located at a remote location communicates electronically with the central server | a single processing station initiates communication with the central server via a telephone system and modem |
| "communications device" | a device able to communicate electronically | a telephone system including a modem |
| "downloading" | receiving electronically | transferring via telephone system and modem |
| "operatively connected" | able to communicate electronically | connected via telephone system and a modem |
| "connected to the central server" | able to communicate electronically with the central server | linked via telephone system and modem |
| "connected to the processing station" | able to communicate electronically with the processing station | linked via telephone system and modem |

The parties propose similar constructions for similarly disputed terms in the '405 patent relating to communication. Moreover, the parties provide no further rationale for their proposed constructions then as already presented above in regards to the similarly disputed terms of the '405 patent. Thus, the primary dispute is whether data communication should be limited to the preferred embodiment of a telephone system and modem. 3T relies upon the specification providing that the only means of communication is via a modem and telephone system, and in response, Southwest argues that 3T tries to improperly limit the broad claims to the patent's preferred embodiment.

For the reasons stated above in the '405 patent for terms relating to communication, the Court finds that 3T's proposed constructions seek to improperly limits the terms to the patent's preferred embodiment. Thus, the Court adopts the same rationale already presented in the '405 patent for its construction for these similarly disputed terms. The Court construes the terms as follows:

"*accessing the central server by the processing station at one specific remote site*" means "*a processing station located at one specific remote site in electronic communication with the central server*";

"*communications device*" means "*an electronic device capable of transmitting and receiving data*";

"*downloading*" means "*receiving data electronically*";

"*operatively connected*" means "*able to communicate electronically*";

"*connected to the central server*" means "*able to communicate electronically with the central server*"; and

"*connected to the processing station*" means "*able to communicate electronically with the processing station.*"

**8.      Terms relating to printer or printing**

| Claim Language | Southwest's Proposed Construction | 3T's Proposed Construction |
|---|---|---|
| "able to print the site specific coupons" | the ability to physically deposit on paper the written information necessary to create a valid coupon which is particular or unique to the individual remote location where it is printed | a laser printer having internal random access memory and fitted with a conventional MICR toner cartridge that can (1) ignore a paper size error or print on paper that is eight and one half by seven inches; and (2) accept fonts downloaded by a user |
| "prints the site specific coupon on blank paper" | physically depositing on paper the written information necessary to create a valid coupon which is particular or unique to the individual remote location where it is printed on paper that contains no pre-existing information | the printer prints the site specific coupon on paper that is eight and one half by seven inches which may have background color or printing or distinctive watermarks or other overall indicia but which is otherwise unprinted as contrasted with preprinted forms |

The parties propose essentially the same constructions for similarly disputed terms in the '405 patent.  Moreover, the parties provide no further rationale for their proposed constructions then as already stated above in regards to the similarly disputed terms of the '405 patent.

The Court finds no reason, and the parties have presented none, why the terms relating to printer or printing should be given different meanings in the '405 patent and the '673 patent. Thus, the Court adopts the same rationale as presented in the '405 patent for its construction of these disputed terms.  The Court construes the term "*able to print the site specific coupons*" to mean "*a printer at each of the remote locations that can physically deposit the written information necessary to create a valid site specific coupon.*"  The Court construes the term

46

"*prints the site specific coupon on blank paper*" to mean "*physically deposits the written information necessary to create a valid site specific coupon on blank paper.*"

## VI.    CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents.  The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

SIGNED this 23rd day of October, 2009.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE